Good morning. This is Dan Polson. I represent Mr. Thompson. I have a lot of ground to cover, and I actually want to focus on Could you please get that microphone closer to you? Thank you. Absolutely. I have a lot of ground to cover. I want to talk about the search warrant, mainly because the government hasn't really engaged with the arguments that we made that the search warrant was Speak up, sir. I will do my best. Project. I'm going to do my best to talk loudly. The government hasn't really engaged with the argument that we presented that the search warrant in this case was fatally overbroad and that it lacked a factual foundation for drawing the conclusion that Mr. Thompson was engaged in drug trafficking. If you look at the search warrant that was issued to search the contents of Mr. Thompson's cell phone, and it appears at the premise on this idea that Mr. Thompson was a drug trafficker. The problem is, and if you break down the search warrant affidavit into its constituent parts, there simply wasn't any factual foundation for the conclusion that Mr. Thompson was a drug trafficker. The search warrant goes on at length about the habits, the characteristics of drug traffickers based on the officer's training and experience. And in United Okay. So in the affidavit, so we have the pistol was found under his seat, that he had been convicted twice of state felonies in Alaska, that he had been convicted of the federal felony of selling cocaine, right? 2001, yes. Okay. So drugs, gun, that he had four outstanding Anchorage Police Department warrants, and that he was out on conditions of relief. That So what the officer attested that these concerns indicated that the firearm was for the protection of his cocaine and illegal drug dealings, right? So the officer say that in the warrant? That's their theory. All right. And then the officer stated that he learned that the firearm was reported stolen to the Anchorage Police Department, and that in 14-year experience as an Alaska state trooper, had imparted him to the insight that people use cell phones to conduct illegal activities, and that phones keep a record of these conversations. And he further noted, I think in the affidavit, that people use their cell phones to take pictures of themselves and illegal activities, right? And that's pretty much the long and short of it, Judge. But he drew comparisons between this case and United States versus Weber. That was a case where you had an affidavit submitted for a search of the defendant's property for evidence of child pornography. The defendant had a prior arrest for child pornography possession. Agents had intercepted what they believed was child pornography to his residence, and the search warrant affidavit in that case, much like the affidavit in this case, included the officer's... So we have two search warrants, though, right? We do, and I think... So we have a second warrant affidavit, too. Correct. So which one are you attacking? We're talking about it's 3 a.m. 16-1021. Again, it appears at the record at 2.38. And that was the warrant to actually search the contents of Mr. Thompson's cell phone. And we know that under United States versus Riley that the Supreme Court has flagged the fact that cell phones are uniquely capable of storing vast amounts of information. And in fact, searching someone's phone, you can find a lot more information than you would if you were But going back to Weber and the companion case that was cited in the reply brief, United States versus Underwood, the proposition for both those cases is simply that when an officer is drawing, asking that the magistrate draw inferences about a particular class of persons based on the officer's training and experience, the habits and characteristics of drug distributors or child pornography collectors, there has to be some sort of explanation for why that person whose property is to be searched fits within that class. If you break down the affidavit, again, at ER 238, there is simply nothing there to conclude that Mr. Thompson is engaged, again, specifically in drug trafficking. And let's talk about the circumstances of the trafficking. Well, I don't have a prior for selling cocaine. So your argument would be a little bit better if I were the person on the search warrant, right? Well, and certainly a nearly decade-old conviction for crack that I think is probably the most arguably relevant aspect of what they've included in the affidavit. But again, going back to Weber, there you had an individual who was in the process of What was he on conditions of release for at the time? Nothing drug-related, to the best of my knowledge. But what was it? What does the record show that it was? I believe it was either a probation violation, and I believe misconduct involving a weapon. Actually, no, let me take that back. It might have been an assault. I don't know off the top of my head. But the point is that the facts of the traffic stop. We have a firearm in the vehicle in which there's three other individuals besides Mr. Thompson. Okay, they've got that fact. They've got the fact that Mr. Thompson lied about his identity. Okay, they've got that. And then the affidavit goes on to say that Mr. Thompson was caught with a white, chalky substance of an undisclosed amount that Nick tested presumptive positive as cocaine. Not, and there's no description about the amount. It just says white, powdery substance. We're not talking about large amounts in any event. And it doesn't disclose what the basis is for believing that this is, in fact, cocaine. It just says Nick test. It doesn't explain what a Nick test is. There's no indicia of drug sales. We don't have any kind of pay-and-oh sheets. There's no scales. There's no records of transactions. There's no witnesses. Well, there is indicia, not of that he was a drug dealer at some point, of sales at some point, with something that's presumptively drugs, right? Well, and I would draw the court. I mean, you have to look at everything. Of course. It's the totality of the circumstances test. But I would draw this Court's attention to Underwood, which was a case where the defendant was arrested in connection with a large-scale distribution of ecstasy. He was arrested in connection with this conspiracy. There was, I think, 24 hours and 20,000 tablets of ecstasy that were seized. The search warrant application in that case said, you know, the defendant was arrested in connection with this conspiracy. And I have reason to believe that the crates that he was caught handling contained ecstasy tablets. And, again, the affidavit goes on at length about the habits and characteristics of drug distributors. Drug distributors often keep records of their transactions and so forth. But, again, nothing to lay the foundation for concluding that the individual was, in fact, a drug distributor. Same problem here. You can hold the two affidavits side by side, and I would say that the distinctions between this case and Underwood are trivial. And going to the stop, since we do have to talk about that, we are challenging the reasonableness of the detention of Mr. Thompson. And, you know, I'm sure this Court is very familiar with Terry. And, essentially, we're just asking that this Court apply the standard that applies under Fourth Amendment reasonableness under the totality of the circumstances. This case began with a request for identification by an officer. The request was made to Mr. Thompson without any kind of explanation as to why the officer was asking for his identification. The seatbelt violation, which the government seized on during the evidentiary hearing, was never addressed right away. And if you look at the record, I believe it was approximately 13 minutes into the stop before Mr. Thompson was informed that the officers were asking for his identification because they were concerned about this seatbelt violation. So, given the fact that Mr. Thompson, at the time of the stop, was on the phone dealing with a family emergency, his brother or his son has been shot, you can understand why, in the circumstances, when an officer is asking for his identification, again, without any explanation for why, Mr. Thompson... Correct. Now, doing that, when you start getting phony names, doesn't that cause some sort of a suspicion as to this person? Well, we would say that Mr. Thompson's evasive answers, without knowing the basis for the officer's claim of authority, shouldn't be factored into the reasonableness analysis. Basically... Why should you say that? Because there's so many different reasons why people don't want to talk to officers. And if you're Mr. Thompson, you understand that simply telling the officer, I don't want to talk to you, I don't have anything to say, isn't really an option. If he said, I don't want to talk to you, wouldn't that be the end of it? That would have been the end of it, except for the fact that most people, and again, most people understand... Mr. Thompson chose not to remain silent, but to tell a phony story. And the officer chose not to tell him why he was asking for his identification. He doesn't have to. And that's, again, I guess there's some tension here in terms of the fact that an officer, as you pointed out... Actually, your client might have been better off if he gave his true name, and then he wouldn't, you know, he wouldn't have beat the ride because he had an outstanding warrant, but they might not have gone the whole rest of it. But that's 20-20 hindsight. But the point is that there were any number of reasons why Mr. Thompson was giving these false IDs. But in terms of the basis for the arrest, moving forward to that, I think we've made a pretty strong argument that under Alaska law, the circumstances under which Mr. Thompson was arrested did not amount to probable cause to believe that Mr. Thompson had committed the offense of providing false information to an officer. And that because no seatbelt ticket was actually being issued, that the officer didn't have the right to detain Mr. Thompson. And we would call out the fact that even the officer who arrested Mr. Thompson, it was University of Alaska Fairbanks officer Boudreaux, disclaimed the idea that he could have cited Mr. Thompson for the seatbelt violation. He said, this is a trooper case, because Mr. Thompson was pulled over by an Alaska state trooper. If there was going to be a ticket issued, it was going to be done by them, not by me. So in this situation where we have this nonexistent seatbelt violation, we would just say that the circumstances underlying the detention and ultimately the arrest failed to comply with the Fourth Amendment. I've got about 4 minutes and 20 seconds, and I'll reserve that for rebuttal. Thank you. We'll hear from the government. Good morning. May it please the Court. My name is Will Taylor. I represent the government in this appeal. I'd like to start off talking about the search warrant. The search warrant wasn't just seeking evidence for evidence related to drug trafficking. It also requested evidence for felony possession and for felony possession of narcotics. So there's three different crimes that were being investigated under the search warrant. So, I mean, there's certainly sufficient... If you're arrested alone on sale or distribution, it's a tough argument for you, don't you think? If it's just on distribution? Yeah. I mean, I have trouble distinguishing this case from Underwood on that basis. You have a personal use amount of drugs, and you're searching for sale. What justified that, given the facts on the table, except for perhaps the gun under the seat? That's about it. Well, Underwood had a personal use of marijuana, and then they got a search warrant for her house for distribution of ecstasy. So there was no nexus between the drugs or anything of that nature. So I think you have the false names. You have his prior convictions. And I think you can make the logical leap. He was lying about his name because he didn't want them to know about his prior convictions. He had cocaine on him. That's justification for wanting to lie, even if you're not trying to sell it. Sure. I mean, what takes this case out of mere possession in terms of suspicion of possession to suspicion of sale? So I think you have the gun that happens to be stolen as well. And that's kind of a known trade for people involved in drug trafficking, that they will often trade drugs for stolen guns. You also have $796 in cash. You have him lying about his name. And again, it's just a fair probability. But the trafficking, again, is not the only evidence that the search warrant was seeking. It was also seeking evidence of the felon in possession and of simply possession of narcotics. So I think when you look at the totality of all that, and, you know, having a drug, a federal drug trafficking possession in and of itself is certainly very relevant information that's in the search warrant. So where did the picture came from? The picture was on his cell phone. Okay. And that was a picture of him possessing the gun. Possessing allegedly the same weapon two days before or something like that. Correct. And so, you know, as Trubervick also testified, you know, in his experience, there's often evidence related to these crimes on the cell phones. He relied upon it in good faith. He brought that warrant between two different state judges, first the seizure warrant and then the search warrant. So I think it's objectively reasonable for him to also believe that he could rely on that in good faith. I do want to talk about the traffic stop if there's no more questions about the search warrant at this point. So as this court pointed out, had Mr. Thompson simply said, I don't want to identify myself, that likely could have been the end of the story. But when he affirmatively starts lying about his name, he starts developing reasonable suspicion. And if you actually hear on the audio, he first says his name is Anthony Colin and then says Anthony Collins. So even right away, he's kind of giving two different names. He then gives the second name, which is Christopher Collins, which turns out to be a real person, but it's not him. And that starts to develop even more reasonable suspicion. But it also gives the probable cause at that point that false information has occurred because two different names have occurred. So police officers must know that one of them is false. And you even hear Trooper Howard on the audio saying, clearly you're not being up front with who you are. They then get him out of the car. They ask him for his name again. He gives a third name. So then, you know, not only do we have reasonable suspicion to continue in this investigation, but there's probable cause. And then he's specifically told, you're not wearing your seatbelt, we need to know who you are. So all of this occurs within the first 13 minutes of the traffic stop. And as this Court has held previously, 14 minutes is considered a reasonable period for a traffic stop. So there's two different Alaska statutes at play. First is the authority to detain a person when being stopped or contacted for an infraction or a violation. And what that says is essentially, if you're stopped or contacted, you have to identify yourself, and if not, you can be arrested and brought before the magistrate to identify yourself. And the second is false information. And he actually was arrested for false information. So even though he wasn't issued the seatbelt citation, he was arrested for the false information, which is, he gives false information, and one of the subsection is, with the intent of implicating another in an offense. So when he gave a real person's name while being told, you know, that he's there for the seatbelt violation, he's then implicated another person in the offense, because if the citation were to be issued to that person, and he doesn't show up, there isn't going to be a warrant issued for this innocent person. You know, as the District Court found, you know, once the false information was established, he was lawfully arrested and therefore searched. That's when his ID is found, and then there's a gun found in the car, so he's further detained. So initially he's arrested for the false information and the weapon in the vehicle. So based on both the traffic stop and the gun being found under his seat, and the evidence that was found on his phone, he was indicted for possessing the gun on or about March 22nd. So March 22nd is the date that he was found with the gun under his seat. The argument that there's a variance has two prongs, essentially. First, did the facts at trial materially differ from those alleged in the indictment? So the government indicted Mr. Thompson for possessing the gun on or about March 22nd, 2016, the day of the traffic stop, and they put, or we put to wit language, a Smith & Wesson Model 60 .38 caliber pistol. So that's the same gun that was seen in the photo on his phone. And as the case law from this circuit and other circuits has said, you know, reason... Well, I think if I were to understand this correctly, it sounds like you introduced the photo to be evidence that he in fact possessed on the 22nd, and then it sort of morphed from there, and then the jury had a question, and then there's a dance that goes on between the lawyers and the judge, and then ultimately there's a decision to instruct the jury in a certain way. I think counsel for defendant appellant had originally proffered a certain way that he would like, and the court said, well, no, I'm not going to do this, but then I'll do that. And then everyone agreed that that was okay. So the government's theory was continual possession. It was that it was his gun, and in my closing statements, I argued it was his gun. This is part of his uniform. It was compared to what he was wearing the night of the traffic stop and what he was seen wearing when he's possessing the gun on March 20th. I said he was caught red-handed when he had pictures of the gun, and I said if you only focus on the traffic stop, sure, there's potential other people. Well, yeah, if he hadn't had the gun before, when you had how many people that were in the car? Like four or something? Three other people. Three other people. Well, four total. And so other people could, well, arguably it was under where he was seated, right? But arguably it wasn't his car, right? So the defense would be, hey, I got in the car. I didn't know that there was a gun under the passenger seat, right? So you anticipated that, and you got a picture of him with, I don't think you can see the serial number on it, but it looks like very similar and there's some other marking on the gun that makes it look very obvious it's the same gun, right? Correct, and I went over that extensively with Trooper Vic and in closing arguments. So were you really arguing continuous possession, or were you really just introducing the photo to say, hey, look, he was the one. He was possessing it when everyone else was in the car, because, look, he had it two days before. So that's how the defense attorney tried to characterize it when the jury question came in, but that's not the way that it was argued. It wasn't, hey, this is circumstantial evidence that he knew the gun was in the car. It was evidence that this is his gun, and that's why it was indicted on or about March 22. And, again, on or about. I don't think we have the argument in the records, right? It's in the supplemental in the SCR. I did submit it. And, again, you'll see these quotes. And it's not the evidence wasn't, again, presented to highlight that, oh, he should have known the gun was in the car. This was his gun. It was continual possession. And even when we got the jury question, you know, I acknowledged before the judge. I said, correct, it's been our theory that it's continual possession, but the jury could find that he possessed it merely on March 20. That's within the on or about language. The only other, I guess, potential way to indict it would be March 20 through March 22, or I guess two separate counts. But as this Court's found, the on or about language gives the government substantial leeway in how to bring the charges. But, you know, even if this Court were to find that there were a material difference, the second question is, was the variance prejudicial? And I think that's a hard, you know, standard to meet here, because Mr. Thompson obviously knew about what evidence was going to be presented at trial. That's the whole basis for his suppression motion. He knew that this gun, which everyone agrees is the same gun that was in the indictment, was going to be brought in at trial. He even sent his defense investigator to the hotel where they knew the photo had been taken to verify that one of the passengers in the car had actually checked into that hotel. He cross-examined Trooper Vic extensively about, well, isn't he just kind of showing off his shoes, and isn't this a Michael Jordan hat, and things of that nature. And even in his closing argument, he focuses on the photos as well. He said, yeah, sure, there's photos, but there's no context. He gives context. He gives an example of, you know, taking a picture with a fish that someone else had caught or taking a picture with someone else's jackpot down in Las Vegas. So, you know, neither of the factors in a variance analysis are met here, because, again, the date is so close in time, and it's the same weapon. As I point out, it would probably, I mean, it would be different if it was obviously a black semi-automatic Glock that he had in the picture, and the jury starts, well, can we just convict him on that? And the answer is no. But when it's the same gun in that two-day period, there's not a material difference. You know, essentially there was two competing narratives at trial, which is the defendant's narrative that it was the driver, David Treadway's gun, all the way through, and the government's theory, which was that it's Bobby Thompson's gun. And it was on March 20th, and it was on March 22nd. Going briefly to the last issue which was brought up, which is, you know, was it a plain error to find that the gun was possessed and further incident of drug trafficking crime? So here, again, there was no objection to that finding below, not in the PSR and not in the sentencing memo. The evidence, you know, as was pointed out in the PSR and established at trial. And, again, I know the appellant kind of folks as well, there wasn't enough evidence at trial to show that he was drug trafficking. I mean, that was by design. We agreed that we wouldn't bring in evidence of the drugs at trial. But when going through the phone, he's transferring money in a Wells Fargo account for a Taming Ting, who was later federally indicted and pled guilty to drug trafficking. He was in possession of cocaine. He's got photos of the gun on top of marijuana, on top of money. And there's also other drug transaction discussions on his phone. You know, looking at the so there's no plain error in finding that four-point enhancement. He was given a low-end guideline sentence of 110 months. And some of the factors that the court obviously took into account, you know, he's 43 years old, no longer a youthful offender, eight prior assaults, three prior failure to appears, a felony drug trafficking offense where he received 120 months, 17 petitions to revoke probation, a Crips gang member. He possessed a loaded and stolen gun while distributing narcotics. And he also had videos on his cell phone of he was a passenger, but kind of bragging about running from the state troopers in the days leading up to when he was arrested. So for these reasons, you know, this court should uphold the decision of the district court denying the motions to suppress. Am I correct in understanding that even that the two different warrants were signed by different judges? That's not established in the record. Oh, all right. So are you arguing Leon at the end of the day if, say, hypothetically, if the court were not to agree? Yes, Your Honor. Yeah, and that's, you know, that's one of the reasons that Trooper Vick was called to testify, is to say, you know, that I did rely on this warrant in good faith. And, again, we have two different warrants that were issued. And also a federal magistrate and a federal district court judge have also found there was probable cause. So I know that that's not the end of the analysis, but I think it lends some weight to that the officer was, you know, also objectively reasonable when he believed that there was sufficient probable cause there. And, again, you know, even if this court were to find that there were insufficient evidence of the drug trafficking nexus, there's also the felon in possession nexus and simple possession of narcotics. The affidavit was really directed to trafficking, wouldn't you agree? I mean, the bulk of it is talking about drug trafficking and patterns and all that. I don't see much in there about felon in possession. I don't think that was the thrust of the affidavit in support of the search warrant. I don't know if it was the thrust, but it was specifically included in evidence that he was searching for. I think I'm running out of time, but just by nature there's going to be more evidence, more information that needs to be presented to the judge on drug trafficking than felon in possession because felon in possession is relatively straightforward, or drug trafficking can be a little bit more complex or based on specialized knowledge. Thank you. Thank you, Your Honor. I'll pick up where the court just left off. This is a bare bones affidavit. It is relying primarily on. What about Leon? Okay. So Leon actually holds that there is an exception to the good faith exclusionary, good faith exception to the exclusionary rule, and that exception is when you're dealing with a bare bones affidavit. Well, it's a little more, but obviously at least one. I don't know if there were two different search warrants. I don't know if the record shows it was two different judges or as far as that goes, but then you have the district judge as well. And so, well, that isn't the end of the argument. And that certainly isn't. You've got to, I mean, it's not just good faith. I mean, that a reasonable officer would know that this wasn't a valid search warrant, right? Right. And we would say that given that Weber, which is the primary case we're relying on, is over 30 years old, 20, 25 some years old. Well, how would that be so obvious to an officer if it wasn't obvious to judges that signed two search warrants and a district judge? Well, again, this Court is exercising de novo review over the question about whether or not the search warrant was valid. And we would say that given that there's simply no nexus, there's no there there. Within the four corners of the affidavit, there's simply nothing there to draw the conclusion that Mr. Thompson is indeed a drug trafficker. And as the Court just pointed out, there's no discussion about felon in possession in the four corners of the affidavit. It's at the very end where it says, I'm asking for permission to search for evidence related to felon in possession. But there's nothing in the contents of the search warrant to say why evidence related to felon in possession would be on the phone. This was all about drug trafficking. And I want to correct you. It's not the officer's affidavit that people tend to put pictures of themselves, their illicit activities. Right. And that's exactly what was found on the phone. And our position is. Yeah. And that's a very broad proposition. But certainly, in order for the magistrate to perform his or her function, to be that neutral and detached magistrate, there needs to be a factual foundation for drawing the inferences that the officer wants them to draw. If they don't lay the factual foundation for their conclusions, it's a foundationless conclusion. I mean, those are the exact words this Court stated in Underwood. Going back briefly to the arrest, the government's position is that, you know, Mr. Thompson's various false statements were misleading. You know, they were intended to incriminate other persons and so forth. But the government doesn't go back to it. What the government doesn't acknowledge is that the Alaska Court of Appeals has said in Alaska v. Erickson that when a person is being detained in connection with an infraction, a seatbelt violation in that case, that a person isn't being detained in relation to a crime. And that's the prerequisite. That's an element for false information to an officer. The person has to be detained in connection with the crime. A seatbelt violation, the maximum penalty is a $15 fine. And the government hasn't responded to that. You know, at the end of the day, the photographs that were found on the cell phone were perhaps the most damaging part of the government's case. And I think that the comments by the jury indicated that they were distracted by those photos. I mean, the question that they asked the court was essentially, can't we just convict them based on what we saw on the phone? Do we even need to talk about the car? At the same time, I think the way the indictment was framed and the way this case was argued to the jury, this was actually about the traffic stop. And that's what the defense was anticipating, was an argument over the traffic stop, the circumstances surrounding the traffic stop. And because the photographs which were found on the phone were so prejudicial and I think were so prejudicial in the sense that they were properly admitted but nonetheless distracting to the jury, I think that if this court does find that the search warrant was invalid, that I think there is no other recourse but to reverse this conviction and send it back to the district court, excuse me, to grant the suppression of motion and to dismiss this case in its entirety. Thank you. And with that, I will yield the podium. Thank you. Thank you, counsel. Thank you both for your arguments today. The case just argued to be submitted for decision.
judges: Thomas, Callahan, Bea